UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JAMES H. HUNTER,

                        Plaintiff,

           -against-

DEUTSCHE LUFTHANSA AG, GLOBAL
DEFENSE TECHNOLOGY SYSTEMS, INC.,
GLOBAL STRATEGIES GROUP (UNITED
KINGDOM) LIMITED, AN ENGLISH
COMPANY, GLOBAL STRATEGIES
GROUP HOLDING S.A., A LUXEMBOURG
CORPORATION, and ETIHAD AIRWAYS
P.J.S.C.,

                        Defendants.
-----------------------------------------------------------------X

**MEMORANDUM OF DECISION**

09 CV 3166 (RJD) (JMA)

DEARIE, District Judge.

       Plaintiff, a resident of the State of Washington, contracted in 2008 with Global Services Group (Middle East) FZE ("Global FZE") to provide airport security services in Baghdad, Iraq. Plaintiff's journey to Baghdad did not proceed as intended.  After a flight cancellation while in transit, plaintiff was re-routed through Abu Dhabi with assurances that weapons in his checked baggage would pose no problems with the authorities. Instead, plaintiff was imprisoned for over one month under harsh conditions.

       Again a free man, plaintiff brings an assortment of federal and state law claims against defendants Etihad Airways P.J.S.C. ("Etihad") and Deutsche Lufthansa AG ("Lufthansa") (collectively, the "Airline Defendants"), and against defendants Global Defense & Technology Systems, Inc. ("GTEC"), Global Strategies Group (United Kingdom) Limited ("Global UK") and Global Strategies Group Holding S.A. ("Global S.A.") (collectively, the "Global Defendants"). Finally, plaintiff seeks leave to amend his Complaint for a second time to assert additional claims

against the Global Defendants and add Global FZE–the party with whom plaintiff contracted.

All defendants move to dismiss plaintiff's Amended Complaint (the "Complaint" or "Compl.") under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Additionally, the Global Defendants move to dismiss under Rule 12(b)(2) for lack of personal jurisdiction, and the Airline Defendants argue that the Montreal Convention limits or eliminates their potential liability.  Etihad claims sovereign immunity under the Foreign Sovereign Immunity Act, 28 U.S.C. § 1602, et seq. For the reasons set forth below, the Global Defendants' motion to dismiss for lack of personal jurisdiction is granted, plaintiff's request for leave to file an amended complaint is denied, and the Airline Defendants' motions to dismiss are granted in part, but denied with respect to plaintiff's negligence claim.

## I. BACKGROUND

The following facts are derived from Plaintiff's Amended Complaint and appended supporting materials.

A. The Parties

Plaintiff is a United States Air Force veteran and former Aviation Security Inspector with the Department of Homeland Security.  Compl. ¶ 4.  Between 2006 and 2008, plaintiff provided security services to Iraq's Ministry of Transportation through Global FZE.  Compl. ¶ 4, 10, 28, 32-33.

Lufthansa, a German corporation, is a foreign air carrier, which "regularly operates commercial air service into the Eastern District of New York at John F. Kennedy International Airport" ("JFK"). Compl. ¶ 6.  Lufthansa maintains two offices in New York.  Id.

Etihad, an Abu Dhabi public joint stock company, is a foreign air carrier, which also operates regular commercial air service into JFK. Compl. ¶ 7.  Etihad is authorized to do business in New York by the Department of State.  See ECF Docket # 2, Proof of Service. Etihad also maintains two offices in New York and sells tickets for carriage at JFK. Compl. ¶ 7.

GTEC is a Delaware corporation headquartered in McLean, Virginia. Compl. ¶ 8. Global UK is an English corporation headquartered in London. Compl. ¶¶ 8-9.  Global S.A. is a Luxembourg holding corporation. Compl. ¶ 8.  According to the Complaint, these Global Defendants[1] sought "to take advantage of security and intelligence businesses on a worldwide level by holding themselves out to the public" and "conduct[ing themselves] as a single economic unit and enterprise."  Id. For example, Global UK personnel in London "perform[ed] functions for other Global entities around the globe," such as responding to email and telephone inquiries. Compl. ¶ 9.

B. Factual Background

1. Plaintiff Contracts to Provide Airport Security Services Within Iraq

In or about 2006, a Global employee in London solicited plaintiff "to facilitate Global's objectives at the Baghdad International Airport in Iraq." Compl. ¶ 28.  Between 2006 and 2008, plaintiff completed three tours for Global FZE as a security consultant for the Iraq Ministry of Transportation at the Baghdad Airport. Compl. ¶¶ 30-33, 35.

In the summer of 2008, plaintiff again agreed "to return to work for Global in Baghdad at the airport as [plaintiff] had done several times before." Compl. ¶ 36.  Having previously had "numerous difficulties with the provision of weaponry required for his employment," however,

---

[1] Throughout the Complaint, plaintiff refers to each of the Global Defendants interchangeably as "Global." Throughout this Memorandum, the Court distinguishes between the individual Global entities where appropriate (and possible).

plaintiff received permission from Global to bring his own weapons for use during his impending fourth tour in Iraq.[2]  Compl. ¶¶ 37-41.

Plaintiff's travel to Baghdad consisted of three legs. First, plaintiff flew via United Airlines from Washington to Frankfurt, Germany, where he was booked on a flight with Lufthansa to Dubai, in the United Arab Emirates ("UAE").  Compl. ¶ 42.  Plaintiff would then remain "in transit" in Dubai for an Iraq airline flight directly to Baghdad.[3]  Id.  These flight arrangements "were approved by Global." Id.  Nonetheless, plaintiff "was very concerned about the manner in which the firearms he had purchased would be transported to Baghdad."  Id.  Plaintiff inquired of representatives of United Airlines and Lufthansa, who informed plaintiff that "so long as his arrival at his destination with his firearms was approved and lawful, [they] would be pleased to carry his firearms." Compl. ¶¶ 44-45.  Plaintiff "confirmed his arrangements with Global and with United." Compl. ¶ 46.

### 2. Plaintiff's Travels to Iraq Are Disrupted

On July 30, 2008, plaintiff arrived in Frankfurt to learn that his connecting flight to Dubai was cancelled due to a strike. Compl. ¶ 51. A Lufthansa representative then offered plaintiff two options:  Plaintiff could remain in Germany and fly to Dubai the following day—in which case, plaintiff would miss his connecting flight to Baghdad—or fly that same day with Etihad to Abu

---

[2] Plaintiff alleges that he "complained frequently to his superiors that the automatic weapons and handguns provided to Global employees in his position at the airport were unsatisfactory and in many cases, dangerous." Compl. ¶ 38. These included "poorly maintained AK-47 semi-automatic rifles," which would be "clearly identifiable and familiar to U.S. military operatives" as the potential weaponry of insurgents. Compl. ¶¶ 38-39.  Likewise, the handguns that Global provided allegedly were "inappropriate," "faulty," and "frequently fell out of their holsters."  Id.  As a result, in July 2008, plaintiff purchased "a semi-automatic rifle, sighting accessories, and handguns" in Washington for professional use in Baghdad. Compl. ¶¶ 40-41.

[3] This alleged itinerary differs from the Complaint's description of plaintiff's travel for his first three tours.  In connection with those prior tours, plaintiff allegedly traveled via round-trip ticket between Washington and Dubai, while "[s]eparately Global arranged travel to Baghdad." Compl. ¶¶ 32, 35.

Dhabi "and travel onward to Dubai on a Lufthansa chartered 'shuttle.'" [4] Id.  Plaintiff opted for the latter option, but not before informing the Lufthansa agent of his concern about the weapons in his checked luggage. Compl. ¶ 52.  The Lufthansa agent replied:  "'This is no problem, now go, quickly, before the Etihad flight closes, pick up your boarding pass down the hall at the Etihad desk, and your bag will travel on the flight with you.'" Compl. ¶ 53. Prior to picking up his boarding pass, plaintiff also told an Etihad employee "face-to-face" about the contents of his baggage.[5] Compl. ¶ 56.

### 3. Abu Dhabi Officials Imprison Plaintiff

Upon entering the public terminal in Abu Dhabi, plaintiff could not immediately locate his luggage and Abu Dhabi police and customs officials then became involved.  Compl. ¶ 59. Plaintiff claimed his luggage, identified his employer as "Global in Iraq," and explained the circumstances leading to the change in his itinerary, as well as the contents of his luggage, to "Etihad employees, to the police who investigated, and to the Customs Authorities who investigated." Id.  Only then did plaintiff discover "that being 'shuttled' to Dubai meant entering the country of Abu Dhabi," necessitating an appropriate visa and a weapons license.[6] Compl. ¶¶ 59-60, 92 (emphasis in original).   Plaintiff possessed a valid entry visa for Iraq alone. Compl. ¶ 62.

Ensuing events are hazy.   Plaintiff spent the next several days "in a police controlled airport hotel." Compl.  ¶ 64.  "Within a day or so of his confinement at the airport," Lufthansa

---

[4] In his initial Complaint, which named solely Lufthansa and Etihad as defendants, plaintiff quotes the Lufthansa agent as telling plaintiff he would be "shuttled by ground" from Abu Dhabi to Dubai on a "chartered bus." ECF Docket # 1, Original Complaint ¶¶ 33, 40.
[5] Plaintiff's Complaint does not indicate whether the Etihad employee offered any affirmative reassurances as did Lufthansa's employee.
[6] Abu Dhabi is not a "country." It is the second largest city in the UAE and also the name of the largest of the UAE "emirates," seven of which make up the UAE.

and Etihad offered plaintiff the opportunity to purchase a ticket back to Frankfurt and then on to Dubai, which would keep plaintiff "in transit" without having to enter Abu Dhabi. Compl. ¶ 86. According to a Lufthansa representative, this travel arrangement "'was something that they had done before for a group of English paramilitaries who had run into the same problem." Id. Plaintiff booked a flight on Etihad but "was told [by Abu Dhabi authorities] he could not fly out," and instead was transferred to a police station for interrogation. Compl. ¶¶ 65, 87.

On or about August 3, 2008, the Abu Dhabi police telephoned a Global employee named Martin Strutton to confirm the details of plaintiff's employment. Compl. ¶ 66.   "[A]uthorities in Abu Dhabi" told plaintiff that had Strutton confirmed his employment, plaintiff "would have gone free." Id. A Global FZE employee named Kevin Pye instructed Strutton to "den[y] any knowledge of plaintiff's employment or involvement with Global." Id.  Following Strutton's subsequent denial, plaintiff was convicted and incarcerated within the "Al Wathba Prison on the charges of unlawfully importing firearms into Abu Dhabi and entry without a visa." Compl. ¶ 69.

Plaintiff spent a total of thirty-seven days inside of Al Wathba.  The conditions of plaintiff's confinement were "terrible," "revolting" and "deplorable." Compl. ¶¶ 72-75.  For example, plaintiff's cell was overcrowded and unsanitary, he was deprived of both sleep and his blood pressure medication, and "[c]orporal punishment was frequent." Id.  After plaintiff's release, authorities ordered plaintiff to remain in an expensive Abu Dhabi hotel, at his own expense, for an additional seventeen days. Compl. ¶¶ 77-78.  According to plaintiff, his treatment and confinement has led to "life-long physical and mental damage," including a heart condition, a worsening of his blood pressure condition, and symptoms of Post-Traumatic Stress Disorder. Compl. ¶¶ 89-92.  Later, upon checking his mail and email, plaintiff learned that Global FZE had

terminated his employment only a few days after his arrest, on August 6, 2008, for his failure to arrive in Baghdad on schedule or inform Global FZE of his whereabouts. Compl. ¶ 78.

### C. Procedural History

In July 2009, plaintiff commenced this action against the Airline Defendants.   In November 2009, plaintiff amended the Complaint to include claims against all Global entities except for his alleged employer in the Middle East, Global FZE.[7]  Defendants separately moved to dismiss the Amended Complaint in March 2010. By Order dated March 31, 2011, this Court granted the Global Defendants' motion to dismiss in its entirety and granted in part and denied in part the motions to dismiss by the Airline Defendants.   See ECF Docket # 96. That Order describes the relevant procedural history in more detail; this Memorandum explains the Court's decisions.

## II. DISCUSSION

### A. The Court Lacks Personal Jurisdiction over the Global Defendants

The Global Defendants moved the Court to dismiss all of Plaintiff's claims for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).[8]

---

[7] Ostensibly, plaintiff declined to add Global FZE as a defendant in order to escape the preclusive effect of a contract arbitration clause, which mandates arbitration of all claims arising out of his contract with Global FZE. In October 2010, plaintiff filed a second action naming only Global FZE as a defendant, in which he requested a declaratory judgment invalidating the arbitration provision. See Hunter v. Global Strategies Group (Middle East) FTZE, No. 10-cv-4786(RJD)(JMA). That action was terminated after this Court denied plaintiff's request for expedited service of process pursuant to Federal Rule of Civil Procedure 4(f)(3). Plaintiff thus failed to serve Global FZE within the allowable time. Plaintiff sought to amend his Complaint in this action to seek similar relief against Global FZE, but for reasons discussed infra Part II.B, that request is denied.

[8] Contrary to Plaintiff's argument in his Memorandum in Opposition to the Defendants' Motion to Dismiss, ("Opp. Mem.") at 28, 30, the Global Defendants have not waived their Rule 12(b)(2) motion by combining it with a Rule 12(b)(6) motion. See Fed. R. Civ. P. 12(b) ("No defense or objection is waived by joining it with one or more other defenses or objections . . .."). Furthermore, although the Global Defendants made clear in their Memorandum of Law accompanying their Motion to Dismiss that they were not seeking to compel arbitration of the underlying claims, ECF Docket # 51, Memorandum in Support of Global Defendants' Motion to Dismiss ("Global Def. Mem.") at 6-7, district courts must always "inquire whether the court would have jurisdiction, save for the arbitration agreement, over a suit arising out of the controversy between the parties." Vaden v. Discover Bank, 556 U.S. 49, 70 (2009) (internal quotations and brackets omitted).

In deciding a pre-trial motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), a district court has "considerable procedural leeway," and may make its determination on the "basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981). A plaintiff is not entitled to jurisdictional discovery where the allegations are insufficient to "establish a prima facie case of [personal jurisdiction]." Jazini v. Nissan Motor Co., 148 F.3d 181, 185-86 (2d Cir. 1998). Nevertheless, when deciding a 12(b)(2) motion based solely on affidavits, a plaintiff may "defeat the motion [to dismiss on personal jurisdiction grounds] by pleading in good faith legally sufficient allegations of jurisdiction," Id. at 184 (internal citations and quotations omitted), all of which "are construed in the light most favorable to the plaintiff [with] . . . doubts . . . resolved in the plaintiff's favor." Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001) (internal quotations omitted).

The Court's inquiry is governed by Federal Rule of Civil Procedure 4(k)(1)(A), which "establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located," Id., provided that "such an exercise of jurisdiction comports with the Fifth Amendment's Due Process Clause." Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 94 (2d Cir. 2000). For our purposes, therefore, the critical question is "whether the defendants may be subjected to the jurisdiction of the courts of the State of New York." Id. The sole alleged basis for personal jurisdiction over the Global Defendants is that they were "doing business" in New York State at the time the Complaint was filed and thus subject to "general personal jurisdiction." N.Y. C.P.L.R. § 301.

The "doing business" standard entails a high threshold showing. "[A] corporation is 'doing business' and is therefore 'present' in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts, if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'" Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985) (quoting Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 267 (N.Y. 1917)). "[N]ecessarily fact intensive," the inquiry requires a district court to "analyze a defendant's connections to the forum state not for the sake of contact-counting, but rather for whether such contacts show a continuous, permanent and substantial activity in New York." Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990) (internal quotations omitted).

Each individual defendant company under the Global Defendant umbrella need not be subject to personal jurisdiction in their own right for this Court to exercise jurisdiction over them. "'Federal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court." Transfield ER Cape Ltd. v. Indus. Carriers, Inc., 571 F.3d 221, 224 (2d Cir. 2009) (quoting Patin v. Thoroughbred Power Boats, 294 F.3d 640, 653 (5th Cir. 2002)); see also Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 142-143 (2d Cir. 1991) (observing that for jurisdictional purposes, "alter egos are treated as one entity").

I need not decide whether the Global Defendants are alter egos of one another as plaintiff contends and the defendants vigorously deny. See Compl. ¶¶ 8-24; Global Def. Mem. at 16-19. Even accepting as true plaintiff's allegation that the Global Defendants do operate in reality as a

single entity, plaintiff still fails to make out a *prima facie* case of jurisdiction because none of the Global Defendants, alone or in tandem, was doing business in New York when the Complaint was filed, as required under N.Y. C.P.L.R. § 301.[9]

The "traditional set of indicia" for personal jurisdiction is not present in this case. Wiwa, 226 F.3d at 98. None of the Global Defendants is or has ever been headquartered in New York, incorporated in New York, maintained an office or bank account in New York,[10] or had any employees who work in New York. See Compl. ¶¶ 8-24; Global Def. Mem. at 15 (citing ECF Docket # 52, Declaration of Frank Engel ¶¶ 3-6 (Global S.A.); ECF Docket # 53, Declaration of John Hillen (GTEC) ¶¶ 6-9; ECF Docket # 54, Declaration of Paul White (Global U.K.) ¶¶ 3-6; ECF Docket # 58 Second Declaration of John Hillen ¶ 8). Rather, plaintiff predicates his argument for personal jurisdiction over the Global Defendants entirely on GTEC's contacts with New York. Taken together, however, GTEC's alleged contacts are not the "continuous, permanent and substantial activity in New York," required for personal jurisdiction. Landoil, 918 F.2d at 1043.

First, plaintiff cites to GTEC's listing on the NASDAQ stock exchange, as well as several other transactions and contacts related to this stock listing occurring in New York. These stock-related transactions and contacts include: (1) Executing an underwriting agreement with two New York companies, Cowen & Company and SunTrust Bank, to sell GTEC shares, ECF

---

[9] For the same reason, I also reject plaintiff's request for jurisdictional discovery. See, e.g., Stutts v. De Dietrich Grp., 465 F.Supp.2d 156, 169 (E.D.N.Y. 2006) (Glasser, J.) (observing that "courts in this circuit routinely reject requests for jurisdictional discovery" in like circumstances where plaintiff has failed to allege a "prima facie case of jurisdiction" and citing cases).

[10] Plaintiff mentions, without further elaboration, a 2006 transaction when plaintiff was paid by Global FZE from a New York bank account. Compl. ¶ 18. But plaintiff himself admits that the bank account "appears to be a bank account unrelated to [Global FZE]." Id. Global FZE for its part clarified that during the time period in question, they "did all their banking with HSBC in Dubai . . . including all payments made to independent contractors such as [plaintiff]." ECF Docket # 57, Declaration of Fletcher Cox ¶ 6. Global FZE did not have "any knowledge of whether HSBC used any other bank to clear or route payments." Id. at ¶ 8. In any event, the existence of a bank account by itself would "not subject [a defendant] to general jurisdiction." Arroyo v. Mountain Sch., 892 N.Y.S.2d 74, 76 (N.Y. App. Div. 2009).

Docket # 65, June 15, 2010 Affidavit of Thatcher Stone ("Pl. June 15, 2010 Aff."), Exhibits ("Exhs") 2-4; (2) hiring a New York transfer agent and registrar, Pl. June 15, 2010 Aff., Exh. 5; (3) hiring a New York public relations firm to distribute GTEC's prospectus, Pl. June 15, 2010 Aff., Exh. 6; and on at least two occasions, (4) allowing GTEC executives to travel to New York to "tout [GTEC] stock at investment conferences." Pl. June 15, 2010 Aff. ¶ 4; Id. Exh. 7; March 8, 2010 Affidavit of Thatcher Stone, Exh. 1. Neither GTEC's NASDAQ listing, nor these other alleged "ancillary steps in support of [GTEC's] listing on a New York exchange," however, are sufficient to confer personal jurisdiction over GTEC or the Global Defendants.[11] Wiwa, 226 F.3d at 97-98 ("[P]revailing caselaw accords foreign corporations substantial latitude to list their securities on New York-based stock exchanges and to take the steps necessary to facilitate those listings . . . without thereby subjecting themselves to New York jurisdiction for unrelated occurrences.").

The companies hired by GTEC incident to their stock listing were not "primarily employed by [GTEC] and not engaged in similar services for other clients," so as to be considered an "agent" or "mere department" of GTEC sufficient to confer personal jurisdiction over the foreign company. Wiwa, 226 F.3d at 95-96 (finding personal jurisdiction over foreign corporation predicated upon presence of Investor Relations Office in New York, where the Office "devoted one hundred percent of their time to the defendants' business."); see also Jazini, 148 F.3d at 184 (holding that even where plaintiff proves that a "subsidiary" of a company is present in New York, "the subsidiary must be either an 'agent' or a 'mere department' of the foreign parent" "for New York courts to have personal jurisdiction"). Furthermore, the fact that GTEC executives may have visited New York on occasion to "tout their stock" is of no

---

[11] Plaintiff admits as much, stating in his attorney's jurisdictional affidavit: "A NASDAQ listing and the transfer agent alone would not suffice [as] . . . evidence of a systematic set of connections with New York . . .." Pl. June 15, 2010 Aff. ¶ 5.

consequence here. <u>See</u> <u>Landoil</u>, 918 F.2d at 1042, 1045 (thirteen business trips by foreign company's employees to solicit new business were "insufficient to establish the systematic and continuous presence within the state that New York law requires."); <u>Hoffritz</u>, 763 F.2d at 56-58 (no personal jurisdiction under N.Y. C.P.L.R. § 301 despite repeated visits to New York by corporation's president and sole shareholder to discuss business issues *with plaintiff*) (emphasis added); <u>Marson Med. Int'l, Inc. v. Bauhinia Ltd.</u>, 948 F.Supp. 180, 186 (E.D.N.Y. 1996) (Glasser, J.) (evidence that foreign corporation's "officers routinely attend business meetings and trade shows in New York . . . is insufficient to show that [the defendant] is doing business in New York State.").

Second, to prove jurisdiction, plaintiff points to a business relationship between GTEC and Purvis Systems, a subcontractor headquartered in Rhode Island, but with two "Regional Business Offices" in New York. Pl. June 15, 2010 Aff. ¶ 4. However, "[a] business relationship with a New York entity does not provide a sufficient basis for jurisdiction at least in the absence of a showing that that company has become an agent or division of the company over which the plaintiff seeks to exercise personal jurisdiction." <u>Landoil</u>, 918 F.2d at 1046. No such showing has been made here.

Lastly, plaintiff points to GTEC's consent to service of process in New York in its contracts with Cowen & Company and SunTrust Bank and argues that "just agreeing to accept jurisdiction in New York is sufficient as a basis for in personam jurisdiction." Pl. June 15, 2010 Aff. ¶ 5. This argument is entirely unpersuasive and misstates the law. Both contracts explicitly limit GTEC's submission to jurisdiction New York to "action[s] or other proceeding[s] arising out of *this agreement*." Pl. June 15, 2010 Aff. Exh. 3 (emphasis added); <u>Id.</u>, Exh. 4 ("[A]ny action or proceeding arising out of or relating to *this agreement*") (emphasis added). A

company's submission to jurisdiction and service of process in New York pursuant only to isolated contracts does not thereby signal its unrestricted consent to personal jurisdiction in New York for all future claims brought against it. Plaintiff's citation to The Rockefeller Univ. v. Ligand Pharmaceuticals Inc., 581 F.Supp.2d 461 (S.D.N.Y. 2008) is unavailing.[12] Pl. June 15, 2010 Aff. ¶ 5. In Rockefeller, the defendant had long been registered as a foreign corporation authorized to do business in New York, had accordingly designated the New York Secretary of State as its agent upon whom service may be served, and also had *elected* to designate a registered agent in New York upon whom process could be served for *any claim* against it. Id. at 465. In holding that the defendant was subject to personal jurisdiction in New York, the Rockefeller court merely reaffirmed the long-held view that in "maintaining an active authorization to do business and not taking steps to surrender it as it has a right to do, defendant was on constructive notice that New York deems an authorization to do business as consent to jurisdiction." Id. at 466; see also Nationwide Mut. Ins. Co. v. Morning Sun Bus Co., No. 10-CV-1777 (ADS)(AKT), 2011 WL 381612, at *5 (E.D.N.Y. Feb. 2, 2011) (Spatt, J.) ("Pursuant to New York Business Corporation Law § 304(b), when a company obtains authorization to do business in New York, there is a 'concomitant designation of the Secretary of State as its agent for service of process,' which is considered a 'consent to in personam jurisdiction.'") (quoting Augsbury Corp. v. Petrokey Corp., 470 N.Y.S.2d 787, 789 (N.Y. App. Div. 1983)).

For the foregoing reasons, all claims against the Global Defendants are dismissed without prejudice to refile in a forum where personal jurisdiction may be established.[13]

---

[12] Plaintiff also cites to Wiwa to support this point. Pl. June 15, 2010 Aff. ¶ 5. However, Wiwa merely quotes the limitation embedded in Federal Rule of Civil Procedure 4(k)(1)(A) that a court may only exercise jurisdiction over a defendant if the defendant "could be subjected to the jurisdiction of a court of general jurisdiction" in New York. Wiwa, 226 F.3d at 94 (quoting Fed. R. Civ. P. 4(k)(1)(A)).

[13] An alternative ground upon which to dismiss the action against the Global Defendant's is plaintiff's failure to join a necessary party—Global FZE—who "cannot be joined" due to lack of personal jurisdiction. Fed. R. Civ. P. 19(b). Plaintiff's tortious interference claim asserted against alter-ego Global Defendants is more properly considered a

**B. Plaintiff's Request to Add Global FZE to the Action as a Defendant or Otherwise Amend the Already Once-Amended Complaint is Denied Because Allowing Leave to Amend Would be "Futile"**

In an October 6, 2010 letter to the Court, plaintiff requested that he be granted permission to amend the Complaint, for a second time, to add additional claims against the Global Defendants, provide additional allegations of jurisdiction against the Global Defendants to "unambiguously provoke discovery on [the jurisdiction] issue," and add Global FZE as an additional defendant. ECF Docket # 84. I denied plaintiff's request for the following reasons.

Federal Rule of Civil Procedure 15(a)(2) instructs that "a party may amend its pleading only with the opposing party's written consent or the court's leave" and that leave to amend "should [be] freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). "[J]ustice does not so require" a district court to allow a party to replead, however, if such "amendment would be futile." Xiang Li v. Morrisville State Coll., 434 Fed.Appx. 34, 35 (2d Cir. 2011); see also Goodrich v. Long Island R.R. Co., 654 F.3d 190, 200 (2d Cir. 2011). An amendment is futile where there is either "no merit in the proposed amendments," Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990), or "if the proposed claim could not withstand a motion to dismiss . . .." Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002). Accordingly, a proposed amendment is "futile" if the court would lack personal jurisdiction over the would-be defendant. See Spiegel v. Schulmann, 604 F.3d 72, 78 (2d Cir. 2010) (affirming district court's order denying leave to amend where amendment would be "futile" because the "plaintiffs had failed to demonstrate personal jurisdiction" over defendant). In any case, "the grant or denial of

---

breach of contract claim because a "party cannot tortuously interfere with its own contract." Multi-Juice, S.A. v. Snapple Beverage Corp., No. 02 Civ. 4635(RPP), 2003 WL 1961636, at *5 (S.D.N.Y. Apr. 25, 2003) (Patterson, J.) (internal quotations omitted). As contractual counterparty, Global FZE is a necessary and indispensable party to any breach of contract claim. For reasons discussed infra Part II.B, however, the Court would not be able to exercise personal jurisdiction over Global FZE.

an opportunity to amend is within the discretion of the District Court." Foman v. Davis, 371 U.S. 178, 182 (1962).

As already discussed, the Court does not have personal jurisdiction over the Global Defendants, see supra Part II.A., and so the addition of claims against them would likewise be unable to withstand a motion to dismiss for lack of personal jurisdiction. The grant of such an amendment would, therefore, be futile. Moreover, plaintiff was already afforded ample opportunity to set forth a *prima facie* case for personal jurisdiction over the Global Defendants, including in their original Complaint, Amended Complaint, Memorandum in Opposition to the Global Defendants' Motion to Dismiss, and two supporting affidavits with numerous exhibits. Based on a thorough review of the pleadings and all supporting documents, I have already decided that plaintiff has not alleged a *prima facie* case for personal jurisdiction either to defeat the defendants' motion to dismiss or compel jurisdictional discovery. Plaintiff does not indicate in any way how amending his allegations once again would "unambiguously provoke discovery" on the issue of jurisdiction.

I find that plaintiff's request to add Global FZE as a defendant must also be denied on futility grounds for lack of personal jurisdiction. First, there is no allegation that Global FZE, a Dubai corporation, has *any* contacts with New York State or alternatively that there is any basis upon which to exercise "specific jurisdiction." N.Y. C.P.L.R. §§ 301, 302. Taking as true plaintiff's claim in his proposed amended complaint that Global FZE is "but one tentacle of the 'Global' Group of companies," see Hunter v. Global Strategies Group (Middle East) FTZE, No. 10-cv-4786(RJD)(JMA), ECF Docket # 1, Complaint ¶ 17, and thus an alter-ego of the Global Defendants, the court would not have personal jurisdiction over Global FZE for the very same

reason the Court has already determined that it has no personal jurisdiction over the Global Defendants: Alter ego GTEC was not "doing business" in New York. See supra Part II.A.

To the extent that plaintiff asks the Court to exercise jurisdiction over Global FZE under Federal Rule of Civil Procedure 4(k)(2) "based on its contacts with the United States as a whole, when the defendant is not subject to personal jurisdiction in any state," I must also deny leave to amend. Dardana Ltd. v. Yuganskneftegaz, 317 F.3d 202, 207 (2d Cir. 2003). First, under plaintiff's own alter-ego argument, Global FZE would be subject to personal jurisdiction in Virginia where GTEC is headquartered and thus Rule 4(k)(2) would not apply.[14] Second, even if Global FZE were not subject to personal jurisdiction in any state, to establish personal jurisdiction, Rule 4(k)(2) still requires that plaintiff "serv[e] a summons" on the defendant or that the defendant "fil[e] a waiver of service." Fed. R. Civ. P. 4(k)(2). However, as already discussed, in plaintiff's related case, Hunter v. Global Strategies Group (Middle East) FTZE, No. 10-cv-4786(RJD)(JMA), plaintiff failed to serve Global FZE properly and I denied plaintiff's request to authorize expedited service of process on the defendant pursuant to Federal Rule of Civil Procedure 4(f)(3). See No. 10-cv-4786(RJD)(JMA), ECF Docket # 11, Order. No further action to serve the defendant occurred then or since and there is no reason to believe that the circumstances would be different if plaintiff were allowed to add Global FZE to the present matter.

---

[14] Washington is another state where Global FZE is arguably subject to personal jurisdiction. The majority of contacts between plaintiff and Global FZE regarding the job and contract of service occurred by phone while plaintiff resided in Spokane, Washington, and the contract that ultimately led to the trip at issue in this case was signed in Spokane. See Compl. ¶¶ 28-32, 35-36, 40; Compl. Exh. B, Independent Contractor Services Agreement. Compare Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir. 2004) ("A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there.") (emphasis added); with Van Steenwyk v. Interamerican Mgmt. Consulting Corp., 834 F.Supp. 336, 342 (E.D. Wa. 1993) (analyzing Washington State's long-arm jurisdiction statute and finding no personal jurisdiction even though "substance of agreement was formed in Washington" because "the economic relationships created by the contract were to have found their fulfillment outside this state.") (emphasis added).

For the foregoing reasons, plaintiff's request for leave to amend his Complaint is denied.

C. Plaintiff's Claims Against the Defendant Airlines

Plaintiff brings state law tort and contract claims against the Defendant Airlines, as well as a federal racial discrimination claim pursuant to Section 1981 against Lufthansa. The Defendant Airlines, in turn, argue that all of plaintiff's state law claims are preempted and exclusively governed by The Montreal Convention ("the Convention") and that under the Convention, plaintiff has stated no claim for relief. See ECF Docket # 46, Memorandum in Support of Lufthansa's Motion to Dismiss ("Lufthansa Def. Mem.") at 4-9; ECF Docket # 60, Memorandum in Support of Etihad's Motion to Dismiss ("Etihad Def. Mem.") at 9-16. In the alternative, the Defendant Airlines move the court to dismiss all of plaintiff's state law claims pursuant to Federal Rule of Civil Procedure 12(b)(6) to the extent that any of his claims are not governed and/or not barred by the Convention. Lufthansa moves to dismiss plaintiff's federal Section 1981 claim for failure to state a claim. Lufthansa Def. Mem. at 9-22; Etihad Def. Mem. at 16-25.

Etihad also moves to dismiss all claims brought against it, arguing that the Court lacks subject matter jurisdiction because Etihad is wholly owned by and thus "[a]n agency or instrumentality of" the United Arab Emirates immune from suit under the Foreign Sovereign Immunity Act. See 28 U.S.C. § 1603(b). Plaintiff argues that Etihad should not be accorded sovereign immunity in this case because its filings with the United States Department of Transportation (1) waived its sovereign immunity for "operations in international air transportation that, according to the contract of carriage, include a point in the United States as a

point of origin, point of destination, or agreed stopping place,"[15] Opp. Mem. at 16, and that under

plaintiff's contract of carriage, (2) Etihad's activity falls under the "commercial activity"

exception in 28 U.S.C. § 1605(a)(2).[16] Opp. Mem. at 17-18. Both Etihad's alleged waiver and the

commercial activity exception require "a significant nexus between the commercial activity [in

the United States] upon which the exception is based and a plaintiff's cause of action."

Kensington Int'l Ltd. V. Itoua, 505 F.3d 147, 155 (2d Cir. 2007) (internal quotations omitted).

Thus the fact that Etihad conducts business in the United States is insufficient by itself to defeat

sovereign immunity, contrary to plaintiff's suggestion. See id. Instead, plaintiff's ticket must

actually have been purchased in the United States or include the United States on its itinerary.

See, e.g., Barkanic v. Gen. Admin. of Civil Aviation of People's Rep. of China, 822 F.2d 11, 14

(2d Cir. 1987) (denying sovereign immunity where tickets for domestic travel within China

"were bought and paid for in the United States and available and used for passage on the fatal

flight"); Sugarman v. Aeromexico, Inc., 626 F.2d 270, 272-73 (3d Cir. 1980) (denying sovereign

immunity where tickets at issue were bought in the United States and were round-trip from

Mexico to New York City). Whether Etihad has immunity under 28 U.S.C. § 1603 and thus

whether this Court may exercise subject matter jurisdiction over claims against it, turns on

whether Etihad took over plaintiff's contract of carriage with United and Lufthansa, which was

purchased in the United States and included as a point of origin and/or destination Spokane,

when it agreed to carry plaintiff on to Abu Dhabi. Because the Court has insufficient information

---

[15] 28 U.S.C. § 1605(a)(1) provides: "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the foreign state has waived its immunity either explicitly or by implication . . . ."

[16] 28 U.S.C. § 1605(a)(2) provides: "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States . . . ."

to consider at this early stage in the proceedings, Etihad's motion to dismiss for lack of subject matter jurisdiction is denied in favor of further discovery on this limited issue. See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004).

Accordingly, I will first address why the Convention does not preempt plaintiff's state law claims against the Defendant Airlines and then address why all of plaintiff's claims, except for his state law negligence claim, should be dismissed for failure to state a claim upon which relief may be granted.

1.   The Montreal Convention Does Not Preempt Plaintiff's Claims

The Convention, which entered into force on November 4, 2003, is a "comprehensive international treaty of private international air law," Ehrlich v. American Airlines, Inc., 360 F.3d 366, 371 n. 4 (2d Cir. 2004) (internal citations and quotations omitted), which stresses "the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution." Id. (citing Preamble to Convention). Although the Convention "unifie[d] and replace[d] the system of liability that derives" from its predecessor, the Warsaw Convention, the Convention still retains many of its original provisions and terms and thus courts have continued to rely on cases interpreting equivalent provisions in the Warsaw Convention. See, e.g., Paradis v. Ghana Airways Ltd., 348 F.Supp.2d 106, 111 (S.D.N.Y. 2004) (Stein, J.), aff'd, 194 Fed.Appx. 5 (2d Cir. 2006) ("[T]he preemptive effect is identical regardless of whether the Montreal Convention or the Warsaw Convention . . . applies; thus the Court need not decide which Convention controls.").

The "key provision of [the Convention] is its statement of preemptive effect." Id. at 110. Article 29 of the Convention provides: "In the carriage of passengers, baggage and cargo, any

action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention." Convention for International Carriage by Air, May 28, 1999, reprinted in S. Treaty Doc. No. 106-45, 1999 WL 33292734, at *38 (2000). In determining whether a particular claim is preempted, the Supreme Court has cautioned that "The Convention's preemptive effect on local law extends no further than the Convention's own substantive scope." El Al Israel Airlines, Ltd. V. Tsui Yuan Tseng, 525 U.S. 155, 172 (1999) (internal quotations and modifications omitted). The Convention's "substantive scope," in turn, is defined by the "Convention's liability provisions." King v. American Airlines, Inc., 284 F.3d 352, 358 (2d Cir. 2002). Only the Convention's liability provisions contained in Article 17 and Article 19 are relevant to the instant action.

  a. Plaintiff's Claims Fall Outside the "Substantive Scope" of Article 17

  Article 17 of the Convention holds airlines "liable for damage . . . caused . . . on board the aircraft or in the course of any of the operations of embarking or disembarking." S. Treaty Doc. No. 106-45, 1999 WL 33292734, at *33. "A carrier, therefore, is indisputably subject to liability under *local law* for injuries arising outside of that scope: e.g., for passenger injuries *occurring before any of the operations of embarking or disembarking*." Tseng, 525 U.S. at 172 (internal quotations omitted) (emphasis added).

  This Circuit applies a "flexible" multi-factor test to determine whether a passenger was in the course of "any of the operations of embarking or disembarking" at the time of injury so as to preempt a plaintiff's state law claims under Article 17. Buonocore v. Trans World Airlines, Inc., 900 F.2d 8, 10 (2d Cir. 1990). "The factors to be considered are: (1) the activity of the passengers at the time of the accident; (2) the restrictions, if any, on their movement; (3) the

imminence of actual boarding; and (4) the physical proximity of the passengers to the gate." Id. No single factor is dispositive and a "court's determination hinges upon the specific facts of the case presented and how analogous or distinguishable those facts are from the facts of previously decided cases." Alleyn v. Port Auth. of New York, 58 F.Supp.2d 15, 20 (E.D.N.Y. 1999) (Trager, J.). It is the situs of the alleged "accident," as opposed to the location of the alleged "damage sustained" that is critical. See Singh v. N. American Airlines, 426 F.Supp.2d 38, 47 (E.D.N.Y. 2006) (Amon, J.) ("[T]he plain reading of Article 17's language focuses on the accident which caused the damage so sustained and not the manifestation of the damage itself.") (internal quotations omitted)

Neither Lufthansa nor Etihad adequately address the application of Article 17 to the case sub judice. Lufthansa casts aside Article 17 entirely, arguing that plaintiff's claims, "if any, should be treated as a delay claim" pursuant to Article 19, an argument which I address, infra Part II.C.1.b. See Lufthansa Def. Mem. at 7. Etihad merely assumes that Article 17 applies and then argues that plaintiff cannot allege a plausible cause of action under the Convention. See Etihad Def. Mem. at 13-16. I find, however, that Article 17 does not govern this case because the alleged negligence of the Defendant Airlines occurred "before any of the operations of embarking or disembarking." Tseng, 525 U.S. at 172.

The factual allegations pertinent to the issue of embarkation/disembarkation are as follows. When plaintiff landed in Frankfurt, Germany, he "disembarked from the aircraft and proceeded" to wait for two hours "inside the general public terminal . . .." Compl. ¶ 50. The public terminal was "not controlled by Lufthansa." Id. It is unclear from the Complaint whether plaintiff was in a sterile or secure portion of the airport, or whether he would need to clear security again. See id. When the Lufthansa gate agent arrived approximately two hours later,

plaintiff was informed that his flight had been cancelled and was "directed to the transfer desk and from that location directed to the main ticketing counter near the A Terminal Lufthansa check-in desks." Id. Again it is unclear from the Complaint whether the "A Terminal Lufthansa check-in desks" were in a sterile portion of the airport. In any event, it was here where plaintiff had the alleged conversation with the Lufthansa employee about his travel options, including the option to travel on an Etihad flight to Abu Dhabi "in a couple of hours." Comp. ¶¶ 50-51. It was also here where a Luftansa employee informed plaintiff that his "special baggage" would not pose any risks upon landing in Abu Dhabi. Comp. ¶¶ 50-53. After the assurance, plaintiff agreed to fly with Etihad to Abu Dhabi. Compl. ¶ 54. The Lufthansa employee then had a conversation with Etihad to confirm that plaintiff's baggage had arrived and would be transferred to the Abu Dhabi flight. Plaintiff was instructed to go to the Etihad desk to pick up his boarding pass. Compl. ¶¶ 52-53. At the Etihad check-in desk, plaintiff had a "face-to-face" conversation with an Etihad employee, informing the Etihad employee "that he was the owner of firearms in his checked luggage." Compl. ¶ 56. Plaintiff then picked up his boarding pass and at some unspecified point later boarded the flight.

The alleged actions of Lufthansa—the conversation, the contract, the misinformation— occurred in the course of plaintiff deciding whether to board a flight at all, which is logically prior to, and outside the ambit of, embarkation. As to Etihad, even though plaintiff had "checked-in" to his Etihad flight, went to pick up his boarding pass at the counter, and spoke with the Etihad employee, plaintiff still "had ample time to roam freely about the [public] terminal before his flight was called." Buonocore, 900 F.2d at 10 (finding no preemption under the Convention where plaintiff had already checked in to his flight, but was in a public area of the airport, two hours before his flight was to depart). Boarding was not imminent: Plaintiff had a

"couple of hours" before the Etihad flight was scheduled to depart. Compl. ¶ 51. And though it is unclear from the Complaint, the "main ticketing counters," where the conversations giving rise to the alleged negligence took place, were likely not in particularly close proximity to the departure gates. Compl. ¶ 50. See, e.g., Pacitti v. Delta Air Lines, Inc., No. 04-CV-3197 (DLI)(MDG), 2008 WL 919634, at *6 (E.D.N.Y. Apr. 3, 2008) (Irizarry, J.) (holding that plaintiff's accident did not occur in course of embarking or disembarking even where distance between plaintiff and departure gate at time of accident was "approximately ninety to ninety-five yards away . . ..").

Plaintiff's circumstances are thus readily distinguishable from the circumstances present in other cases holding that Article 17 preempted a plaintiff's state law claims. See, e.g., King, 284 F.3d at 359 ("[Plaintiffs] had already checked in for their flight, received their boarding passes, and boarded the vehicle that was to transport them from the terminal to the aircraft."); Day v. Trans World Airlines, Inc., 528 F.2d 31, 33 (2d Cir. 1975) ("[P]laintiffs had already surrendered their tickets . . . [and] were assembled at the departure gate, virtually ready to proceed to the aircraft. The passengers were not free agents roaming at will through the terminal."); Rajcoor v. Air India Ltd., 89 F.Supp.2d 324, 328 (E.D.N.Y. 2000) (Ross, J.) ("[Plaintiff] was only one step removed from stepping onto the plane and was approaching the gate in order to complete that last step. The flight was departing shortly and he was not free to engage in any pursuits of his own choosing except at risk of missing his plane."); Alleyn, 58 F.Supp.2d at 21-22 ("[Plaintiff] had just deplaned . . . [and was] being led along a restricted access corridor directly to the immigration checkpoint . . . before she had reached the common terminal area"); Ricotta v. Iberia Lineas Aereas De Espana, 482 F.Supp. 497, 500 (E.D.N.Y. 1979) (Costantino, J.) (plaintiff had just exited the aircraft, was in an area of the airport restricted

to arriving personnel, had not yet entered any common terminal area and was acting at the direction of the airline when injured).

Taking into account all of the relevant factors—location, activity, control, and imminence—plaintiff plainly was not in the process of either embarking (or disembarking) when the alleged actions giving rise to his claims took place. Therefore, Article 17 of the Convention does not act to preempt plaintiff's state law claims.

> b.   Plaintiff's Claims Fall Outside the "Substantive Scope" of Article 19

Article 19 of the Convention holds airlines "liable for damage occasioned by delay in the carriage by air of passengers, baggage or cargo." S. Treaty Doc. No. 106-45, 1999 WL 33292734, at *34.

The cancellation of plaintiff's planned flight from Frankfurt to Dubai, which resulted from "industrial actions or strikes involving Lufthansa," is a form of delay that could be covered by Article 19. Although his flight was *cancelled* due to the strike, plaintiff cannot avail himself of the rule that "Article 19 of the Montreal Convention . . . governs claims for delay, not nonperformance." In re Nigeria Charter Flights Contract Litig., 520 F.Supp.2d 447, 455 (E.D.N.Y. 2007). Here, plaintiff was still able to procure substitute transportation with at least the intention that he would arrive at his ultimate destination as planned. See Paradis, 348 F.Supp.2d at 112 ("A passenger cannot convert a mere delay into contractual non-performance by choosing to obtain more punctual conveyance."). Nevertheless, Article 19 does not govern plaintiff's claims because plaintiff's arrest, interrogation, conviction, and imprisonment in Abu Dhabi were not "occasioned by" plaintiff's flight delay. S. Treaty Doc. No. 106-45, 1999 WL 33292734, at *34. Rather, plaintiff's alleged injuries stemmed from the intervening negligence of the Defendant Airlines, separate and apart from the delay.

The reasoning of the Southern District in <u>Maheney v. Air France</u>, 474 F.Supp. 532 (S.D.N.Y. 1979) (Pierce, J.) is instructive. In <u>Maheney</u>, a plaintiff was bumped from her flight resulting in a 24-hour delay. Plaintiff claimed damages based on the incidental costs of renting a van "[a]s a result of her late arrival" at her vacation destination, as well as emotional damage incurred as a result of the "harsh treatment by Air France employees" in bumping her from her flight. <u>Id.</u> at 534. The court held that the claims for the incidental costs "based solely on any delay she experienced" were covered by the Convention, while the claim for emotional harm did not arise under the Convention because it stemmed not from the delay, but from the alleged tortious conduct of the airline employees. <u>Id.</u>; <u>see also</u> <u>Wolgel v. Mexicana Airlines</u>, 821 F.2d 442, 445 (7th Cir. 1987) (holding Convention inapplicable where injuries resulted not from "delay" but from the fact that plaintiffs "never left the airport."). In this case, *all* of plaintiff's alleged damages, including incidental costs like "lodging, and communication calls in the UAE, telephone calls to family, friends, and [plaintiff's] employer, food, [and] lost wages," Compl. ¶ 95, were not "occasioned by" any kind of delay in arrival (in any case, plaintiff *never* arrived in Dubai), but rather, from the alleged negligence of the Defendant Airlines in the course of rerouting and misinforming plaintiff in Frankfurt.

Because the Convention does not preempt any of plaintiff's state law claims, I now turn to the merits of those claims, as well as the merits of plaintiff's Section 1981 federal claim. The Court exercises subject matter jurisdiction over the state law claims through its diversity jurisdiction pursuant to 28 U.S.C. § 1332.

2.   State Law Claims

In evaluating the Airline Defendants' motions to dismiss under Rule 12(b)(6), the Court must "accept all well-pleaded facts as true and consider those facts in the light most favorable to

the plaintiff."  Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 235 (2d Cir. 2008).  "[A] Complaint is insufficient as a matter of law unless it pleads specific facts that 'allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 188 (2d Cir. 2010) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)) (modification in original).  "'Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 58-59 (2d Cir. 2010) (quoting Iqbal, 129 S. Ct. at 1950).  "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'"[17]  Leonard F. v. Israel Discount Bank of N.Y., 199 F.3d 99, 107 (2d Cir. 1999) (quoting Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir.1991)).

### a.  Plaintiff Has Pled State Law Negligence

To make out a *prima facie* case for negligence under New York law, "three elements must be demonstrated: (1) the defendant owed the plaintiff a cognizable duty of care as a matter of law; (2) the defendant breached that duty; and (3) plaintiff suffered damage as a proximate result of that breach." Curley v. AMR Corp., 153 F.3d 5, 13 (2d Cir. 1998).

### i. Duty and Breach

"A common carrier such as an airline generally owes its passengers a duty of reasonable care under the circumstances . . . requir[ing] the common carrier to exercise care which a

---

[17] In supporting and opposing the various motions to dismiss, the parties—most notably plaintiff—submitted voluminous materials beyond the pleadings, including affidavits, declarations, exhibits and statements of domestic and foreign law.  In keeping within the parameters of Rule 12(b)(6), the Court considered these materials only to the extent allowable.

26

reasonably prudent carrier of passengers would exercise under the same circumstances, in keeping with the dangers and risks known to the carrier or which it should reasonably have anticipated." Id. (internal quotations omitted). The defendants do not contest this general duty of care. Rather, Lufthansa cites to this Court's decision in Edem v. Ethiopian Airlines Enter., No. 08 CV 2597(RJD)(LB), 2009 WL 4639393 (E.D.N.Y. Sept. 30, 2009), in which I found that there was *no support . . .*

> . . . for the proposition that an airline owes a duty to inform its passengers of the customs and immigration laws of the countries to which it flies. Indeed, it is the passenger's obligation to acquaint himself with the relevant laws and regulations of foreign countries.

Lufthansa Def. Mem. at 12-13 (citing Edem, at *7). The facts alleged in this case, however, are readily distinguishable from those in Edem. Here plaintiff alleges that Lufthansa *affirmatively misinformed* him after plaintiff *specifically inquired* about whether transporting weapons in accordance with the proposed flight changes would pose any legal consequences. See Compl. ¶¶ 50-53. When asked, the Lufthansa representative responded, "This is no problem." Similarly, although there is no claim that Etihad affirmatively misinformed plaintiff, Etihad was aware of the contents of plaintiff's baggage and of his stated concerns and yet did nothing to suggest the baggage would pose any problems. Prior to booking, the Lufthansa employee informed Etihad via phone about the contents of plaintiff's bag, Compl. ¶ 52, and plaintiff also "told Etihad's employee in Frankfurt, face-to-face, that he was the owner of firearms in his checked luggage," but Etihad did not take steps to inform him of any potential customs or immigration problems once armed with the knowledge of the contents of his baggage. Compl. ¶ 56. Plaintiff then, "based on [the] representation . . . that [he] could take his firearms to Abu Dhabi on Etihad, and transit by ground to Dubai, without impediment," proceeded with his new travel plans. Compl. ¶ 54. In Edem, I ruled that the airlines had no affirmative duty to warn passengers of "customs and

immigration laws," <u>Edem</u>, 2009 WL 4639393 at *7, but did not address what, if any, duty airlines had to provide accurate information about such laws once a passenger affirmatively inquires.

Moreover, plaintiff claims that "several weeks prior to [plaintiff's] arrival in Abu Dhabi with his firearms" Lufthansa had encountered precisely the same problem with "English mercenaries en route to security positions in the Middle East . . . mistakenly diverted . . . to Abu Dhabi instated [sic] of Dubai . . .." Compl. ¶ 85. These mercenaries "were given the opportunity to purchase return passage on Lufthansa or Etihad to return to Frankfurt . . . thereby avoiding the onerous Abu Dhabi firearm prohibitions." <u>Id.</u> This claim at least raises the possibility that both Lufthansa and Etihad were on notice that plaintiff's carrying of "special baggage" into Abu Dhabi may be problematic. <u>See</u> <u>Stanford v. Kuwait Airways Corp.</u>, 89 F.3d 117, 123 (2d Cir. 1996) ("In determining whether a duty exists, a court should examine: (1) the relationship between the parties; and (2) *the reasonable foreseeability of harm to the person injured*.") (emphasis added); <u>Id.</u> at 125 ("'[T]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension.'") (quoting <u>Palsgraf v. Long Island R. Co.</u>, 248 N.Y. 339, 344 (N.Y. 1928)).

While the claims, particularly with respect to Etihad, are modest, I must conclude that when taken as true, the Complaint adequately alleges that the Airline Defendants breached a duty owed to plaintiff.

### ii. Causation

Lufthansa argues that even if plaintiff has pled a cognizable duty that the Airline Defendants breached, plaintiff has still failed to plead causation given that "carrying firearms either in Dubai or Abu Dhabi is illegal" and, therefore, that "[p]laintiff would still have been

arrested for violating UAE law regarding the transportation of firearms regardless of any" alleged statements by the airlines. Lufthansa Def. Mem. at 15-16. In short, the defendants argue that plaintiff's injury would have been as likely to occur without any act or omissions by the airlines. Whether Dubai has the same entry requirements and weapons proscriptions as does Abu Dhabi and more critically, whether plaintiff would have had to pass through customs in Dubai are questions ill-suited for the 12(b)(6) stage.[18] If plaintiff is unable to show, however, that he would not have had to pass through customs in Dubai and thus would not have been as likely to be arrested there as in Abu Dhabi, then his negligence claim will have to be dismissed as a matter of law for failure to demonstrate cause-in-fact. As to proximate cause, there is at least a jury question regarding whether plaintiff's detention was foreseeably caused by the airline's alleged breach of duty. See Stanford, 89 F.3d at 127 ("Although it is arguable whether [injury] was 'foreseeable[,]' . . . such matters are properly left to the trier of fact.").

Plaintiff has made a *prima facie* showing of causation.

### iii. Damages

Plaintiff has also made a *prima facie* showing of damages sustained, including deprivation of liberty, loss of property and employment, financial loss, aggravation of medical conditions, deprivation of medication, and other physical and emotional conditions, as a result of defendants' alleged negligence. See Compl. ¶¶ 69-76, 78, 90-92, 99.

---

[18] Etihad filed an expert affidavit of a UAE lawyer with the Court touching upon the subject. See ECF Docket # 62, Affidavit of Ali Al Aidarous and Exhibits. Of particular note, Etihad's expert admits that plaintiff might not have had to pass through customs if he remained "in transit" through Dubai. Id. at ¶ 36 ("[H]ad [plaintiff] arrived in Dubai with baggage checked directly to Iraq, *although routinely he would not pass the Customs control*, he would have been liable to be charged and convicted for importing firearms without an import license if his baggage had been inspected by the security of Dubai Airport.") (emphasis added).

iv. Tariff Defense

Nonetheless, both airlines argue that plaintiff waived any negligence claim by virtue of agreeing to their respective airline tariffs, both of which include provisions mandating passenger compliance with applicable laws and customs, limiting airline liability for a passenger's failure to so comply, and stating that no airline employee may modify these rules. See Lufthansa Def. Mem. at 13-16, Etihad Def. Mem. at 16-20. This defense requires further development and may be raised again at summary judgment.

As a start, the outcome of this defense hinges on which airline's tariff applied to plaintiff's travels beginning in Frankfurt. Plaintiff argues, not unreasonably, that discovery will show that the only tariff that matters is United's, with which plaintiff fully complied, and that as successive carriages, neither Lufthansa nor Etihad were permitted to change the applicable tariff mid-journey. Opp. Mem. at 26-27.

Further discovery may also show that even if Lufthansa's and/or Etihad's tariffs did apply to plaintiff, the liability provisions contained therein may be unenforceable "terms of adhesion" given the unique circumstances of plaintiff's case. If so proven, liability would then become a matter of comparative fault, which is a question for the fact finder to determine. See Sokolovsky v. Mucip, Inc., 821 N.Y.S.2d 463, 463 (N.Y. App. Div. 2006) ("[C]omparative negligence is a jury question in all but the clearest cases.") (internal quotations omitted). The defendants are right to point out that airline tariffs, in general, "constitute the contract of carriage between passenger and airline and, if valid, conclusively determine the rights and liabilities between the parties." Lufthansa Def. Mem. at 17 & Etihad Def. Mem. at 17 (quoting Edem, 2009 WL 4639393 at *8 (internal quotations omitted)). Here, however, the allegations indicate that plaintiff was (1) forced, (2) through no fault of his own, to (3) renegotiate his trip mid-journey,

(4) under a tight deadline, (5) with two different airlines, (6) in a foreign country, (7) after already going out of his way to acquaint himself with the original airline, United's, contract of carriage and through United and Lufthansa airlines representatives, UAE customs laws, (8) in the face of misinformation from Lufthansa and Etihad, and (9) with no realistic alternative choice but to accept the Lufthansa/Etihad travel option offered given plaintiff's connecting flight from Dubai to Iraq and his strict start date. See Gillman v. Chase Manhattan Bank, 73 N.Y.2d 1, 10 (N.Y. 1988) (holding that determination of unconscionability is a "flexible one . . . intended to be sensitive to the realities and nuances of the bargaining process," but requiring "some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.") (internal quotations omitted). Again, this determination is ill-suited for the 12(b)(6) stage.

For the foregoing reasons defendants' motions to dismiss plaintiff's negligence claim is denied in favor of additional discovery.

b.   Plaintiff Has Not Pled a Plausible Claim for Breach of Contract

To establish a breach of contract under New York law, plaintiff must plead the (1) existence of a contract, (2) breached by the other party; and (3) damages suffered as a result of the breach. See Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000). Plaintiff alleges: "[E]ach of Lufthansa and Etihad respectively breached its contract of carriage with [plaintiff] by not bringing him to Dubai by air in accordance with his contract . . .." Compl. ¶ 95. The Airline Defendants' alleged breach of contract in this case, however, is tied inextricably to the Airline Defendant's alleged negligence and all of the damages alleged for breach of contract are indistinct from those alleged in his negligence action. In other words, but-for the Defendant Airlines' alleged negligence, plaintiff would not have been detained in Abu Dhabi and the

31

Defendant Airlines would have brought plaintiff to Dubai in accordance with their contracts. Moreover, any potential impossibility defense the Defendant Airlines' may raise predicated on the intervening actions of Abu Dhabi authorities necessarily turns on the Airline Defendant's own role in bringing about those very actions. Because the grounds for plaintiff's Complaint more appropriately "sound[] in negligence, not contract," Breiner v. Stone, 122 F.3d 1055 (Table), 1997 WL 416942, *2 (2d Cir. July 25, 1997), and are merely duplicative of plaintiff's negligence action, defendants' motions to dismiss are granted. See, e.g., Harleysville Worcester Ins. Co. v. Hurwitz, No. 02 Civ. 7612(RLC), 2005 WL 774166, at *5 (S.D.N.Y. Apr. 6, 2005) (Carter, J.) (dismissing plaintiff's subrogation claim as duplicative of legal malpractice claim where "the claims ar[o]se from the same conduct—defendants' alleged acts of negligence—and involve[d] no distinct damages.")

### c. Plaintiff Has Not Pled a Plausible Claim for False Arrest and/or Imprisonment

To allege that a defendant is liable for false arrest and/or imprisonment under New York Law, a plaintiff "must prove that the defendant *intended or instigated* the confinement of the plaintiff." King v. Crosslands Sav. Bank, 111 F.3d 251, 257 (2d Cir. 1997) (emphasis in original); see also Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995) (observing that "the common law tort of false arrest is a species of false imprisonment" and explaining that the same requirements apply to both). Additionally, the existence of probable cause for an arrest is a "complete defense" to the claims of false arrest and imprisonment. Guadagni v. N.Y.C. Transit Auth., No. 08-CV-3163 (CPS)(SMG), 2009 WL 1910953, at *5 (E.D.N.Y. June 30, 2009) (Sifton, J.). Here, plaintiff has not made any allegation that the Airline Defendants intended for him to be arrested or imprisoned and plaintiff concedes that he did not comply with Abu Dhabi weapons laws, which supports defendants argument that probable cause for his arrest existed.

Defendants' motions to dismiss plaintiff's false arrest and/or imprisonment claim are, therefore, granted.

> d. Plaintiff Has Not Pled a Plausible Claim for Intentional Infliction of Emotional Distress

The tort of intentional infliction of emotional distress requires a plaintiff to plead: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." Howell v. N.Y. Post Co., 81 N.Y.2d 115, 121 (N.Y. 1993). I have already held that plaintiff's allegations make a case for negligence. Plaintiff, however, makes no plausible allegation that the action or inaction of the airline employees were "inten[ded] to cause . . . severe emotional distress," let alone that their actions or inaction were "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. at 121-22.

The Airline Defendants' motions to dismiss plaintiff's intentional infliction of emotional distress claim are, therefore, granted.

> 3. Federal Claim: Plaintiff Has Not Pled a Plausible Discrimination Claim under Section 1981

The Second Circuit has held unequivocally that "Congress has not extended Section 1981 to apply to claims arising from discrimination that occurred while a plaintiff was not 'within the jurisdiction of the United States.'" Ofori-Tenkorang v. American Int'l Grp., Inc., 460 F.3d 296, 307 (2d Cir. 2006) (quoting 42 U.S.C. § 1981(a)). There is no claim that any of the allegedly discriminatory acts by Lufthansa occurred within the jurisdiction of the United States.

Accordingly, Lufthansa's motion to dismiss plaintiff's Section 1981 claim is granted.

### III. CONCLUSION

For all of the foregoing reasons, in its order dated March 31, 2011 the Court decided to (1) dismiss all claims against the Global Defendants for lack of personal jurisdiction under Rule 12(b)(2); (2) deny plaintiff's request to add Global FZE or otherwise amend his Complaint; and (3) dismiss all claims against the Airline Defendants, except for plaintiff's state law negligence claim. The parties are directed to continue discovery in accordance with the Court's previous order and this Memorandum of Decision.

SO ORDERED.

Dated: Brooklyn, New York
     March 27, 2012                s/ Judge Raymond J. Dearie

                                        _____

                                         RAYMOND J. DEARIE
                                         United States District Judge